# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**DISNEY ENTERPRISES, INC.,**
**Plaintiff,**

**-vs-** **Case No. 6:04-cv-1565-Orl-18JGG**

**FUNTIME GETAWAY, INC., d/b/a A1 Travel Reservations, a/k/a a1travelreservations, a/k/a funtimegetaway.com, ROBERT WALDORF, a/k/a Robert Waldon, DEBORAH WALDORF, TODD WALDORF, FLORIDA TRAVEL ESCAPES, INC., TODD HUGGINS, EDITH HUGGINS, JACK HUGGINS, CELEBRATION VACATION, INC., d/b/a celebrationvacation.com, DAVID R. BREEDEN,**
**Defendants.**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for evidentiary hearing on January 31, 2007 on the following motion:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION TO REOPEN CASE (Doc. No. 69)** |
| **FILED:** | **January 14, 2007** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED as to reopening, and otherwise DENIED and CLOSED**.

# I. BACKGROUND

## A. Procedural History

Plaintiff Disney Enterprises, Inc. ["Disney"] filed complaint in this action on October 28, 2004. Disney sought to hold a number of defendants, including Funtime Getaway, Inc. ["Funtime"] and Robert Waldorf ["Waldorf"], liable for trademark and copyright infringement. Docket No. 1. On October 31, 2005, Disney and Funtime jointly stipulated to the entry of a permanent injunction against Funtime, and Waldorf signed the Stipulated Permanent Injunction and Final Order as President of Funtime. Docket No. 61.

On the same day, the Honorable G. Kendall Sharp entered a permanent injunction in this action against Funtime, including its agents, employees, and "those persons in active concert or participation" with Funtime who receive "actual notice" of the injunction. Docket No. 62 at 4. Judge Sharp's order prohibits, *inter alia*, advertisement or marketing of travel packages using "facsimile solicitations" that bear Disney's marks without prior authorization from Disney. *Id.* The order also prohibits Funtime and others from "causing, aiding, and/or abetting any other person" to advertise or market travel packages using such facsimile solicitations. *Id.* at 6. Judge Sharp further retained jurisdiction to enforce the injunction "by way of contempt or otherwise." *Id.*

Disney subsequently filed a notice of dismissal of its suit against Waldorf. Docket No. 67. Judge Sharp entered an order dismissing the case without prejudice as to Waldorf, and directed the Clerk to close the case. Docket No. 68.

On September 14, 2006, Disney filed a motion in which Disney alleges that Defendant Funtime and dismissed defendant Waldorf have violated Judge Sharp's permanent injunction. Docket No. 69. Disney explained that, while prosecuting an unrelated but similar case, Disney received

information that Funtime and Waldorf had transmitted facsimile advertisements in violation of the injunction. In the motion, Disney asks that the Court: 1.) reopen the case; 2.) enter an order to show cause against Funtime and Waldorf as to why they should not be held in contempt for violating the permanent injunction; 3.) permit Disney to serve discovery on Funtime and Waldorf; and 4.) set a hearing to determine an award of damages and attorneys fees to Disney. Docket No. 69 at 1-2. Funtime and Waldorf filed a memorandum in opposition to Disney's Motion to Reopen. Docket No. 97.

The Court granted Disney leave to serve discovery requests on Funtime and Waldorf. Docket No. 70. The Court also ordered Funtime and Waldorf to show cause at a hearing on January 31, 2007 why they should not be held in violation of Judge Sharp's permanent injunction and why damages and attorney's fees should not be awarded to Disney. Docket No. 83 at 5. The Court further ordered Disney to file and serve an accounting of damages and fees sought as a result of the alleged violations. Docket No. 91. On January 5, 2007, Disney filed its accounting in which it asks the Court to award Disney damages in the amount of $413,889, plus $20,605 in attorney's fees and costs. Docket No. 92 at 16.

On January 31, 2007, the undersigned conducted an evidentiary hearing to determine whether Waldorf and Funtime should be held in contempt for violating Judge Sharp's permanent injunction, and the amount of damages and attorney's fees, if appropriate. Disney presented the testimony of Waldorf, and Funtime and Waldorf presented the testimony of Waldorf and Steve Dickerson.

Disney alleges that in January 2006, and possibly through March 2006, Funtime and Waldorf authorized and directed that two one-page advertisements which include Disney's marks [collectively "the Faxes"] be disseminated by facsimile in violation of Judge Sharp's permanent injunction. *See*

*id.*; *see also* Docket Nos. 99-2, 99-3. Disney does not claim that Waldorf himself sent the faxes. Instead, Disney argues that Waldorf controlled two non-party individuals, Stephen Dickerson and Brett Hiatt, who sent the Faxes. Disney claims that Dickerson sent one of the Faxes ["the Dickerson fax"] around January 2006.[1] Disney claims that Hiatt sent the other fax ["the Hiatt fax"] around January 2006.[2]

Funtime and Waldorf claim that Waldorf did not authorize or direct the sending of the faxes, but that Dickerson and Hiatt sent the advertisements without Waldorf's knowledge and contrary to Waldorf's instructions. *See* Docket No. 97. The parties have stipulated that the two faxes "would have been in violation" of Judge Sharp's permanent injunction if sent by Funtime or Waldorf. Docket No. 99.

**B. <u>The Facts</u>**

Funtime is a Florida corporation with its principal place of business in DeBary, Florida. Funtime sells travel packages under a Florida Seller of Travel number issued by the Florida Department of Agriculture and Consumer Services. Waldorf runs the day-to-day operations of Funtime, and serves as its President. He and his wife, Deborah Waldorf, own 100 percent of Funtime's shares, although Deborah Waldorf no longer controlled or operated the business after June 2006. Funtime does not usually market and advertise its own travel packages. Rather, it sells travel packages through marketers who have agreements with Funtime (but are not owned by Funtime), and

[1]At the hearing, the Dickerson fax was received into evidence as Plaintiff's Exhibit 6. The parties also filed a copy of the Dickerson fax in this case at Docket No. 99-2.

[2]At the hearing, the Hiatt fax was received into evidence as Plaintiff's Exhibit 7. The parties also filed a copy of the Hiatt fax in this case at Docket No. 99-3.

who sell travel under Funtime's Florida Seller of Travel number. During the time period Disney alleges Waldorf and Funtime violated the injunction, Funtime used "call room" marketers. "Call rooms" refer to marketers who operate a bank of telephones to call people to sell travel packages, and receive incoming calls by people interested in purchasing the packages.[3] The call rooms also disseminate advertisements in order to generate calls.

1. The Dickerson Fax

Disney filed this action in October 2004. Prior to September 2005, Waldorf had worked with Steve Dickerson ["Dickerson"], but terminated the business relationship due to erratic, threatening, and violent behavior that may have been related to Dickerson's drug habit. On September 20, 2005 (approximately one month before Judge Sharp entered the injunction in October 2005), Waldorf entered into a written agreement to set up a call room for Dickerson to sell travel packages on behalf of Funtime. *See* Plaintiff's Exhibit 3.

Under the terms of their agreement, Waldorf provided money for rent, electricity, and phone service, including a toll-free number, for a call room to be run by Dickerson using "All the Best Vacations" as his business name. After "set up," Dickerson was to pay his own costs, including advertising costs, rent, and utilities. The agreement provided that Dickerson would receive seventy percent of the "gross sale" of Funtime's travel packages, and was responsible for refunds and cancellations by customers. The agreement further provided that Dickerson "will sell vacation package [sic] in a legal manner and give all sales to [Funtime] for fulfillment." *Id.* Waldorf did not

[3]At the hearing, Disney, Funtime, and Waldorf stipulated to these background facts.

register Dickerson under Funtime's Florida Seller of Travel number (as he was required to do so) because he was not sure their business arrangement would be permanent.

After Judge Sharp entered the injunction on October 31, 2005, Waldorf and Dickerson did not alter their written agreement or enter into a new written agreement. Both Waldorf and Dickerson, however, testified credibly that Waldorf informed Dickerson of the injunction by e-mail, through instant messages, and orally. Both also testified credibly that Waldorf repeatedly told Dickerson not to use the word "Disney" at all.

Between September 2005 and January 2006, Dickerson was responsible for disseminating facsimile advertisements for Waldorf and Funtime. Waldorf and Dickerson agreed that Dickerson would create facsimile advertisements (of vacations to be fulfilled by Funtime), and that Dickerson would arrange and pay for "fax blasts" of the advertisements approved by Waldorf. In a "fax blast," Dickerson paid faxing services (such as Protus or fax.com) to send the advertisements to large numbers of potential customers. Dickerson sent samples of the advertisements to Waldorf for approval prior to arranging the fax blasts. After Waldorf approved the proposed advertisements, Waldorf sent back initialed copies which Dickerson was to use in his fax blasts.

During this time, however, instead of using the approved advertisements, Dickerson often used other advertisements which Dickerson created himself. Waldorf had neither seen nor approved the advertisements. For instance, Dickerson testified that he often sent to Waldorf for approval advertisements that did not contain the word "Disney" or any Disney marks. Waldorf approved these advertisements by initialing and sending them back to Dickerson. Dickerson then, without informing Waldorf, revised the advertisements to include the word "Disney" or Disney marks. Dickerson knew that Waldorf would not have approved his revision. Motivated by his own need for money, Dickerson

nevertheless then sent the revised advertisements to the faxing services to be disseminated in fax blasts.

When customers called to purchase travel, Dickerson's call room received and took orders. Waldorf provided the vacation packages. Waldorf also received the customers' payments, and paid Dickerson seventy percent of the sales. Dickerson then used this money to pay for more advertising and fax blasts, and kept the rest.

Dickerson used different advertisements every week. According to Dickerson, the Dickerson fax is one that he created and sent out in a fax blast sometime in January 2006. Dickerson knew that advertising Disney vacations (using the Disney marks) would make the travel packages more attractive to people and generate more sales. Dickerson admitted that he suffered from a drug addiction at the time, and that he was desperate to make money. In credible testimony, both he and Waldorf repeatedly stated that Dickerson never told Waldorf about the Dickerson fax, and that Waldorf never authorized the sending of the fax.

On January 30, 2006, Waldorf and Dickerson exchanged instant messages in which Waldorf told Dickerson not to use Disney marks.[4] At 9:36 AM, Waldorf typed to Dickerson: "We CANNOT use the DISNEY fonts . . . that's a fact." Defendant's Exhibit 1 at 1 (emphasis in original). Two hours later, on the same day, Waldorf typed: "Can't say Disney." *Id.* Dickerson responded with: "im [sic] not talking about disney . . . just stating a word." *Id.* Waldorf replied: "I know but PLEASE don't say ANYTHING about [Disney]." *Id.* Later that day, Dickerson appeared to be asking Waldorf about

---

[4]At the hearing, instant messages between Waldorf and Dickerson were received into evidence as Defendant's Exhibit 1. In the messages, Waldorf used the screen name "mmvsales," and Dickerson used the screen name "Room." *See* Defendant's Exhibit 1.

the wording for an advertisement. Dickerson typed: "disney world vacation in orlando." *Id.* at 4. Waldorf responded: "WE CANNOT SAY DISNEY WORLD period!!!!!" *Id.* (emphasis in original). Dickerson asked: "what about: celebrate disneys [sic] 50th anniversary[?]" Waldorf answered: "NO!!!!" *Id.*

Both Waldorf and Dickerson testified that Waldorf terminated his agreement with Dickerson around January or February 2006, when Waldorf discovered that Dickerson had been sending unauthorized advertisements. Waldorf testified that he also terminated his agreement with Dickerson because Dickerson was never in the office. Dickerson, however, continued to do marketing for Funtime through another call room marketer, Sea R. Marketing.

On February 14, 2006, Funtime entered into a written agreement with Colleen Robillard, who owned and controlled Sea R. Marketing. Robillard was also Dickerson's fiancée at the time, and subsequently hired Dickerson to work for Sea R. Marketing. Under the terms of the Funtime agreement, Robillard agreed to market Funtime vacations in exchange for seventy-five percent of the sales. Plaintiff's Exhibit 2 at 2. Funtime used a written agreement titled the "Funtime Getaway: Business Agreement," which is a standard pre-printed form that Funtime used with many of its marketers. *See id.*; *see also* Plaintiff's Exhibit 1. The "Funtime Getaway: Business Agreement" does not mention Judge Sharp's injunction or Disney, or specifically prohibit the use of Disney marks. *See* Plaintiff's Exhibit 2. The agreement does state that Funtime "will only fulfill travel packages that are 'qualified' sales," and defines "qualified sales" as "only those offers . . . for which no false, illegal, or exaggerated claims, inducements, advertisements, and/or representations have been made . . ." *Id.* at 2.

At the hearing, Waldorf credibly testified that he told all of his call room marketers not use Disney marks or the word Disney. Because Dickerson worked with Sea R. Marketing and Robillard marketing Funtime vacations, Funtime continued to pay Dickerson directly through at least April 2006. *See* Plaintiff's Exhibit 4 at 1-4 (showing payment to "Steve").

2. The Hiatt Fax

In its motion to reopen, Disney claims that Waldorf also reviewed and authorized the dissemination of the Hiatt fax during the first two weeks of January 2006. *See* Docket No. 69-2 at 6-7. On January 9, 2006, Ryke, Inc., a Florida corporation and "call room" marketer, agreed to advertise and sell Funtime vacation packages. Plaintiff's Exhibit 1. Funtime agreed to pay Ryke, Inc. seventy-five percent of the "total sale," and required Ryke, Inc. to "submit a sales script and verification script for approval from [Funtime]." *Id.* at 2. Brett Hiatt, who owned and controlled Ryke, Inc., and Joseph Loftus, a Funtime employee, signed the written agreement. *See id.* at 5.[5]

The written agreement, the "Funtime Getaway: Business Agreement," is similar to the agreement signed by Robillard, and also does not mention Judge Sharp's injunction or Disney, or specifically prohibit the use of Disney marks. The agreement does state that Funtime "will not allow, does not condone[,] and will not tolerate any type of advertising considered by any government agency or private individual to be illegal . . ." *Id.* at 3. Again, Waldorf testified that he used a pre-printed form that Funtime used with many of its marketers.

Disney, in its motion to reopen, alleges that Hiatt disseminated over 700,000 copies of the Hiatt fax in a fax blast in January 2006. At a deposition taken by Disney in an unrelated case, Hiatt

[5]Loftus actually signed the agreement on the line for "Witnessed By." *See* Plaintiff's Exhibit 1 at 5.

testified that he sent the Hiatt fax in January 2006 after reviewing the advertisement with and receiving approval from Waldorf. *See* Docket No. 69-12. Disney filed an excerpt of the Hiatt deposition in support of its motion to reopen. Disney presented no further evidence from Hiatt, however, and Hiatt did not testify at the hearing.

In addition, Waldorf credibly testified that he did not authorize Hiatt to send the Hiatt fax, and that in fact, he "made a big deal" about informing Hiatt and all of Funtime's marketers of Judge Sharp's injunction. He did not alter the standard "Funtime Getaway: Business Agreement," although he admitted he had time to do so.

## II. THE LAW

On Disney's motion, the Court to entered an order to show cause why Waldorf and Funtime should not be held in contempt for violating Judge Sharp's permanent injunction. The district court has the inherent power to enforce compliance with its lawful orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). To prove a violation of the district court's order, the moving party must establish by clear and convincing evidence that the alleged contemnor violated the order. *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991).

Once the movant has made a prima facie showing, the burden of production then shifts to the violating party to produce evidence explaining the noncompliance. *Id.* In order to satisfy this burden, the violating party must offer proof beyond "a mere assertion of inability," and must introduce evidence supporting its claim. *Id.* The focus of the court's inquiry is "not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in

fact their conduct complied with the order at issue." *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990). A violating party can demonstrate an inability to comply only by showing it has made "in good faith all reasonable efforts to comply." *Id.* The court should not hold a party in contempt if the party attempted with "reasonable diligence" to comply with the court order. *Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984).

Once the court determines that a party has not complied with its order, the court may impose sanctions based upon such noncompliance. The court has the power to impose coercive and compensatory sanctions. *Citronelle-Mobile Gathering, Inc.*, 943 F.2d at 1304. When fashioning a sanction in order to secure compliance, the court should consider "the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.* (citations omitted). Due process requires that the court inform the alleged contemnor of the contemptuous conduct, and provide a hearing in which the alleged contemnor may explain why the court should not make a contempt finding. *Id.* Sanctions may include a coercive daily fine, a compensatory fine, coercive incarceration, and attorneys' fees and costs. *Id.; see also, Perfect Fit Indus., Inc. v. Acme Quilting Co. Inc.*, 673 F.2d 53 (2nd Cir. 1982) (coercive fine of $5,000 per day did not constitute an abuse of discretion).

The district court may use the Lanham Act as a guide for structuring a civil contempt sanction related to trademark infringement. *Howard Johnson Co., Inc.*, 892 F.2d at 1519 (holding that the district court's use of the Lanham Act to provide "a framework for determining the compensatory civil contempt award" was not an abuse of discretion). Under the Lanham Act, a plaintiff whose trademark rights have been violated is entitled to recover: 1.) defendant's profits, 2.) any damages sustained by

the plaintiff, and 3.) the costs of the action. 15 U.S.C. § 1117(a). The Lanham Act also gives the court discretion to treble the actual damage award and raise or lower the profit award as necessary to compensate the plaintiff. *Id.*

## III. ANALYSIS

Disney, Funtime, and Waldorf stipulate that the two Faxes "would have been in violation" of Judge Sharp's permanent injunction (Docket No. 99) if Funtime or Waldorf had sent them. The parties also agree that Waldorf and Funtime are bound by the injunction.

It is also clear that Dickerson and Hiatt, not Waldorf, sent the Faxes to the faxing services. Judge Sharp's injunction prohibits Funtime and Waldorf (as Funtime's agent) from "causing, aiding, and/or abetting any other person" to violate the injunction. Docket No. 52 at 4, 6. Therefore, the Court must determine whether Funtime and Waldorf caused Dickerson or Hiatt to send the two specified Faxes which, by stipulation, contain infringing marks.[6]

Waldorf did not know about the two infringing Faxes before they were sent, and did not authorize or allow the two Faxes to be sent. Of course, Waldorf did cause the call rooms to send faxes, but not the two *infringing* Faxes. As principal support for its allegations, Disney repeatedly asserted that Waldorf did not provide Dickerson and Hiatt with written notice of Judge Sharp's injunction. Although true, this proves little. Disney offered no proof that Waldorf purposely failed to inform Dickerson or Hiatt of the injunction, or that Waldorf failed to take sufficient precautions to

[6] At the hearing, Disney framed the issue as whether Waldorf (and therefore Funtime) had the "ability to control the call rooms that sent the Faxes." Funtime and Waldorf articulated a different standard: whether Waldorf aided and abetted the sending of the two Faxes. Disney argued that "they are the same issue." The Court finds, however, that the issues are not identical. Waldorf could have caused, aided and abetted the sending of the two faxes without having an ability to control the call rooms. Also, Waldorf could have had the legal right to control the content of all faxes sent from the call rooms, but never have aided and abetted the transmission of unapproved infringing faxes.

avoid violating of the injunction. Rather, the evidence showed that Waldorf and Funtime attempted with reasonably diligence to comply with the injunction, and to prevent the call rooms from disseminating advertisements that would violate the injunction. Waldorf did not know that Dickerson and Hiatt were going to send the Faxes, and the Faxes were sent despite Waldorf's efforts to prevent it.[7]

Disney did not establish by clear and convincing evidence that Waldorf and Funtime violated Judge Sharp's injunction by causing, aiding, and/or abetting Dickerson and Hiatt in sending the two infringing Faxes. Waldorf credibly testified that he repeatedly warned Dickerson and Hiatt about the injunction; that they could not use Disney marks; and that as a precaution, Waldorf expressly forbade them from using the word "Disney" at all. The Court also finds that Waldorf never saw or authorized the sending of the Faxes prior to the fax blasts.

Dickerson's testimony and Waldorf's testimony corroborate each other, and make sense. Dickerson received a large percentage – seventy-five percent – of the gross sales. Even more Funtime or Waldorf, Dickerson had a strong incentive to increase sales. Dickerson admitted that he hid his use of infringing faxes from Waldorf. Dickerson wanted to make more money to support his

---

[7]The Court construes the term "aiding and abetting" in Judge Sharp's injunction has having its ordinary meaning, as in criminal cases. According to the Eleventh Circuit Pattern Jury Instructions for "Aiding and Abetting (Agency)," the party with the burden of proof must show that "the acts or conduct of an agent, employee or other associate of the Defendant are willfully directed or authorized by the Defendant . . ." ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) (2003) at 50. The Jury Instructions further provide that:

> before any Defendant can be held criminal responsible for the conduct of others[,] it is necessary that the Defendant willfully associate in some way with the crime, and willfully participate in it. Mere presence at the scene of the crime and even knowledge that a crime is being committed are not sufficient to establish that a Defendant either directed or aided and betted the crime . . . . Defendant [must have been] a willful participant and not merely a knowing spectator.

*Id.*

drug habit, and knew that using Disney marks would generate more sales. The instant messages also corroborate the testimony. Dickerson was clearly trying to convince Waldorf to let him use the Disney marks, and Waldorf unequivocally forbade Dickerson from saying "ANYTHING" about Disney. Defendant's Exhibit 1 at 1.

Further, Disney offered no credible evidence to contradict the testimony of Dickerson[8] and Waldorf. At the hearing, Disney emphasized that Dickerson worked with his fiancée Robillard at Sea R. Marketing and continued to receive money from Waldorf and Funtime after January 2006. It is not clear, however, how this proves that Waldorf and Funtime violated the injunction in January 2006.

In addition, Disney points to Hiatt's testimony that Waldorf authorized the sending of the Hiatt fax. But Hiatt did not testify at the hearing *in this case*. An *excerpt* of a deposition from an *unrelated* case is hardly probative, particularly where the declarant was not available at this hearing for cross-examination and assessment of credibility, and was not even subject to cross examination by Funtime and Waldorf during the deposition. There is no clear and convincing evidence that Waldorf and Funtime caused, aided, and/or abetted Dickerson and Hiatt in sending the Faxes.

Accordingly, it is

**RECOMMENDED** that Disney's Motion to Reopen [Docket No. 69] be **GRANTED** as to reopening, and otherwise **DENIED** and **CLOSED.** It is

**FURTHER RECOMMENDED** that the Order to Show Cause against Funtime and Waldorf [*see* Docket Nos. 83, 95, 96] be **DISCHARGED**.

---

[8] Disney asserts that Dickerson has a conviction and is currently serving probation for a drug-related felony. This fact only supports Dickerson's testimony.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on February 27, 2007.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

The Honorable G. Kendall Sharp
Counsel of Record
Unrepresented Party
Courtroom Deputy